Good afternoon. May it please the court, counsel. My name is Mark Dabowski. I represent the plaintiff appellant Donna Geiger. Our position in this case is that both the timing and rationale for the termination of Donna Geiger's benefits in May of 2014, after the benefits had been reaffirmed just a year earlier, was arbitrary and capricious. We also maintain that the way in which Geiger challenged the May 2014 decision was also arbitrary and capricious. With respect to the first issue, we first have to look at what transpired between the May 2013 termination, or rather the reapproval of benefits and the May 2014 termination. In May of 2013, Aetna considered a large volume of medical documentation and decided that the weight of the evidence supported a conclusion that Ms. Geiger was incapable of performing any reasonable occupation, as that term is used in the policy. But your view seems to be that because they apparently, without actually saying too much about it, except Dr. Sircincione's report and not the McPhee view, that somehow they're frozen with that. And new information is developed all the time, and I don't see where in the law they are precluded from taking a new, comprehensive look at the record. Well, the new information subsequent to the determination being made in 2013 was an attending physician statement by Dr. Roy, who reaffirmed that Ms. Geiger's condition remained the same and that she was totally disabled. How many people, maybe you can help me on this, which doctors actually say she's not capable of sedentary work? Maybe the vocabulary matters here, other than Dr. Sircincione. Well, Dr. Sircincione is certainly one. The other is Dr. Roy. Did she say no sedentary work, exactly? Dr. Roy? Dr. Roy, yes. Yes, Dr. Roy indicated no work at all, that Ms. Geiger remained totally disabled. Admittedly, Dr. Feldman did not explicitly say totally disabled, neither did Dr. Farrohar say totally disabled, but the conclusion that Aetna had come to in 2013 was totally disabled from any reasonable occupation. But the point is they've reconsidered, and we are, as you certainly concede, on arbitrary and capricious type review, so when you've got these differing opinions, plus of course the surveillance video, why does that fail the arbitrary and capricious standard? Because the reconsideration here of Dr. McPhee's report came after that report was determined to have been outweighed by Dr. Sircincione's report, and the crucial piece of evidence that suggests that there's something wrong with this decision is the nurse review that was done by Nurse Tierney in 2014 that preceded the denial. Nurse Tierney acknowledged that she had both Dr. McPhee's report and Dr. Sircincione's report, and that they were inconsistent with one another. Dr. Sircincione supported the continuation of benefits, Dr. McPhee not. And then she said, we don't know how that discrepancy was resolved, yet she just suddenly pulled Dr. McPhee's report out and said, that's the report we're going to follow. When her own employer a year before said, no, we're not going to follow Dr. McPhee, we're going to follow Dr. Sircincione. Could you also have the Gutierrez review, right? Well, that came later. That came after the denial. And the biggest problem with Dr. Gutierrez's review is that, well, we're not contending that there was something improper about providing him with the complete record so that he would have the full flavor of the claim. The facts were very different. By the time Dr. Gutierrez got the claim, the surveillance was a year out of date, more than a year out of date. And the surveillance, even in 2013, was essentially the same activity that was depicted in 2012 where Aetna said, never mind, that's not enough for us to conclude that Ms. Geiger is capable of working at a sedentary job. And then when Dr. Gutierrez issued his initial report, the report is sent to Dr. Feldman, the pain treatment specialist. Dr. Feldman writes a short note indicating there are three problems with this report. The most significant problem that Dr. Feldman flagged was the absence of any explicit consideration of the cervical spine issue which had arisen during the preceding year. But Dr. Gutierrez is well aware that the cervical issues are there. He refers to them in his report. He may not have a paragraph quite along the lines that you would like, but he knows it's there. Absolutely. But he's saying that there's absolutely no indication, or he's not saying anything about whether the cervical spine issue is even causing any functional restrictions. And he's saying that Ms. Geiger has full use of her upper extremities when her treating doctors are reporting that there's sensory and strength deficits in the upper extremities. The closest Dr. Gutierrez comes to even commenting on the significance of the cervical spine issue is when he talks about the surgery that was recommended by Dr. Farouhar and writes that there's a good prognosis for further functional improvement. And then he says, based on the risks for post-operative chronic pain, a return to baseline status is very guarded, however. So he's indicating that the surgery is necessary but may not restore full function. And then we get to the issue of the vocational evaluation where the vocational evaluator comes up with two, what she calls, fair job matches, one of which requires a bachelor's degree, which Ms. Geiger doesn't have, and in fact, in the vocational report, she indicates that she doesn't even know what Ms. Geiger's education was, even though it's documented in the file. And the other job she identifies is a commission agent in produce, agricultural produce. When Ms. Geiger's entire professional career was in the telecommunications industry. But the standard does allow for jobs that you could be trained to do, not just those that you've been doing. But this requires training based on the specific vocational preparation of six, of one to two years. So to conclude that she would be able to earn the mean salary, which is what the vocational evaluator chose, which is probably significantly higher than the median salary, immediately is contrary to the terms of the policy, which indicates that she'd be able to earn 60%. The last point that I want to address before reserving the rest of my time for rebuttal is the discovery issue. We raised these issues with the district court and we had asked to take two depositions in the case. One of Dr. Gutierrez and one of the vocational evaluator, Ms. Clifton. And we indicated in our complaint specific allegations as to why we thought that those reports were biased and why discovery would be warranted. This court has had an extensive length of cases regarding discovery in ERISA cases. We have the Pearlman case, then we have the Semien case, but most recently we have the Glenn case, which recognized that the intervening event is the Supreme Court's decision in MetLife v. Glenn. And based on Glenn's recognition that a conflict of interest, a structural conflict of interest exists in all of these cases where the same entity is paying the benefits and deciding the entitlement to benefits, then there should be a softening of the standards set forth in Pearlman and in Semien, although this court has yet to flesh out what that softening is. Where that softening should be. This is a case that represents where that softening should be. Ms. Geiger presented specific allegations where she questioned the validity of the evidence that was being used against her and sought leave to take two depositions of no more than two hours in length. And given the proportionality requirements in Rule 26, this fits well within that level of proportionality. I'll reserve the rest of my time. You may do that. Ms. Knapp. Good afternoon, judges, and thank you. My name is Moyenda Knapp, and I represent the defendant, Epeli, in this matter. Thank you for your time. I'm going to start with the arguments with respect to the summary judgment. We're asking that both the decision with respect to summary judgment and the decision with respect to discovery be affirmed. Counsel agrees, has not contested, is well settled, as your Honor has said, that this is the arbitrary and capricious standard. It's a highly deferential standard. So, Ms. Knapp, let me tell you what I thought the weakest part of your position was, and that's this vocational analysis. First, this extremely vague set of transferable skills, which struck me as, you know, kind of plays well with others or something. I mean, they're very general. Secondly, these two jobs, the job development specialist, for which she doesn't have the necessary academic background, and this weird commission agent and agricultural produce job. I mean, if Edna had come forward with something that looked real, that she's either pretty quickly trainable for or already has the training for, that would have struck me as more plausible. Well, your Honor, I will respond to that, that, as was said previously, she can be trained via education, training experience, to assume a job that doesn't have to be the prior job that she had. So, is it Edna's view that there's no outer time limit for that training? So if you, you know, if she decided she wanted to get a job as an associate at a law firm, she might have to go back and get a bachelor's degree and to go to law school for three years and then apply or, you know, maybe she's a reasonably intelligent woman and she could do that. Why not? Yeah, I don't think that the policy provides for any type of time limitation with regard to any training. So, six years, ten years, two years, any of that counts in your view? Well, I don't know that this was outside of the realm of something that she could not do. The policy, again, it does not contain any type of limitations as to the time period for training. Well, it's at least two years because she doesn't have a bachelor's. She has some community colleges, I recall, but she does not have a bachelor's degree and probably at this stage of the game it would require, I'm guessing, two years to complete that. Well, she did have, and with regard to her transferable skills, she was able to make That's what I mean. Make decisions, make judgments. Who wouldn't you say, what employer wants to hire somebody for anything that isn't able to make decisions and exercise some judgment, really? Well, Your Honor, then I would submit as well she had computer skills, she was able to deal with people. She had skills that were transferable in terms of any type of workplace and the question then really becomes, is she in such a position that she cannot do anything within our economy that would prevent her from earning 60% of her earnings? And you might have come up with things. I mean, you've just listed some very sensible criteria, but that's not what Clifton came up with. Clifton comes up with this very peculiar list. Maybe we should just ignore it, but then where's the evidence in the record? The evidence in the record is... that she's able to do what jobs? Well, I would submit that it was through the analysis of, in the vocational rehabilitation analysis where she looked through the programming and she looked at her transferable skills. She looked and figured out that these are jobs that she could do that would earn her the wages. So I would submit that that is within this analysis. And this was a high wage, wasn't it? It was in excess of $30 an hour? $30 an hour. $30 an hour. That is correct. It's 60% of her earnings. And those four jobs met that criteria. There are two other jobs that also met that criteria, but in any event, she can be trained to do this. She had a job before that I think those transferable skills were amenable to, and she could perform a similar type of occupation or be trained to perform a similar type of occupation, even if she had to be educated to perform that occupation or on the job training to perform that occupation. And that would be permissible. I don't know that the policy requires her to find her a job. They just have to say, you know, are there jobs within the economy that she could perform? And they're saying, yes, these are jobs within the economy that you could perform, even if she had to be trained for it. Okay. The other thing I was going to bring up having to do with the surveillance is the weight that Etna seems to have put on the fact that she went shopping at Woodfield Mall and emerged an hour and a half later or so with a bag, because nobody apparently was surveilling her while she's at the mall. So I can imagine, you know, maybe she, Woodfield Mall is enormous, it's the size of a small city, so maybe she's walking all over the mall, but maybe she's gone in and they have these motorized cars that people ride around in, maybe she wasn't, maybe she was shopping for five minutes and then she was going and sitting on a bench for another ten minutes catching her breath. I mean, there's all kinds of possibilities, some of which would suggest that she's really quite capable and others of which would suggest that she isn't. So I'm not holding that against you necessarily, but I don't see how it helps you either. Well, the, she was determined that she could perform sedentary work, sedentary work involves sitting most of the time, but may involve occasional walking or standing. So with regard to the surveillance, it did show her walking. She said she could not walk well. It did show that she was able to walk. She was able to carry objects. But we don't know what was in the bag. I mean, it could have been a bag full of popcorn for all I know, which would not have really weighed very much. Your Honor, who knows what's in the bag, but on sedentary work. So something very light could be in the bag. Correct. Sedentary work is up to ten pounds of force occasionally or negative amount of force. So that would be, if it was something light like popcorn, it would be within the ten pound restriction that she would have to be able to carry to be able to perform sedentary work. So it would be within that restriction. In addition, and I think counsel had alluded to the opinion of Dr. Feldman, Dr. Feldman did not restrict her from being able to walk during any type of a job. Dr. Feldman did not restrict her from being able to work either. Dr. Feldman just said she's going to need to have periods where she is off her feet. And with regard to the surveillance, I don't think Edna placed an opinion on the surveillance. It also relies on two peer reviews that were performed by Dr. Gutierrez. That second peer review by Dr. Gutierrez was following Dr. Feldman's letter. He went back and looked at it. They also looked at her medical records, all the documentation they had in the file. The surveillance was just one aspect that was used in order to support their opinion that her benefits may properly be terminated because she didn't meet the test of disability under the plan. So the surveillance was one aspect, and it did show that she could walk within those restrictions or the restrictions of the time period that were supported by Dr. Feldman and was also supported by Dr. Gutierrez's two peer reviews. Counsel mentioned Dr. Roy, with respect to Dr. Roy, as Edna noted, Dr. Roy did not provide objective evidence to support that she could not work. A plaintiff had indicated in his briefing that Dr. Roy had performed an examination. The document he's referring to was not the date of December 23 of 2014. The document that he's referring to was in January of 2015 when Dr. Roy performed that examination. Dr. Roy is a treating physician. Dr. Roy is a treating physician, and there's no requirement that Edna defer to the opinions of the treating physician. I think that's contrary to the law. Edna need not defer to the opinions of the treating physician. It had two peer reviews that were performed by Dr. Gutierrez. With regard to Dr. Ciricione, I think the court was pretty clear. It is odd that, you know, you have the McPhee and the Ciricione's opinions, and there's a 180 flip. You know, they go, they must have relied on Ciricione the first time. They said, oh, we're going to put you back on, then they reconsider. So I think that's one thing without much explanation about why this is suddenly happening. Well, with regard to Dr. Ciricione, I think that's evidence of their decision making that they objectively looked at this because they had an opinion, an IME from Dr. White, and this is all from 2013. There was intervening medical records, intervening surveillance, intervening comprehensive clinical review, intervening medical documentation between that time. But Dr. Ciricione... Some of it shows that she's getting worse, right? Some of it shows that her back condition is turning into a real problem. We submit that it was not, and the question is whether or not, even if she had a back condition, even if she had other issues, whether it affected her ability to work. With regard to Dr. Ciricione... You don't think a back condition could affect someone's ability to work? I think it could, but the question is whether or not, in this case, it affected her ability. There was objective evidence that affected her ability to work. Dr. Ciricione had formed an opinion that she could work. The independent peer review performed by Dr. McPhee said that she could work. Dr. Buccalow said she could work, and there was IME that said she could work. I think that's evidence of their objective decision making if they relied on one physician who said that she could not, as opposed to... All right. Thank you. I think we have your point. I'm sorry, Your Honor? Your time is up, and I thank you for your argument. Thank you, Your Honor. And you have about a half a minute, Mr. DeBofsky, but we'll round it up to a minute. I appreciate the generosity. The bottom line is that Aetna is a fiduciary. The ERISA law makes Aetna a fiduciary, and the Supreme Court has said that Aetna is required to provide higher-than-marketplace quality standards when they review the claim. This was a result-oriented decision with many, many holes that raise serious questions about Aetna's objectivity and whether Aetna was motivated more by its bias rather than by doing the job it was required to do under ERISA. This is a hard record to make that argument on because they did reinstate her benefits. They seem to be looking at the record and trying to come to the correct decision. Which is why the termination a year later is so surprising. Well, but maybe they just looked at it more carefully. They were trying to give her the benefit of the doubt. They reinstate, but I don't see that this is a record particularly leaning toward a thumb on the scale against benefits. But if they looked at it more carefully, they would have also looked at the back problem that was developing, and there was indeed objective support. She was found to have an acute radiculopathy on EMG testing. The MRI showed the presence of the spinal degeneration, and the exam findings showed the others. All right. Well, thank you very much. We will take the case under advisement, and the Court will be in recess.